IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| HONOLULU DATA ENTRY PROJECT, LTD. dba HDEP INTERNATIONAL | ) ) ) ) | Civ. No. 12-000467 BMK<br><br>AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| D. BELLO ASSOCIATES, DOUGLAS W. BELLO, and JEFFREY A. BATES | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

  This case involves claims and counter-claims made by Honolulu Data Entry Project ("HDEP") and D. Bello Associates ("DBA"), two one-time business partners, arising from the demise of their twenty-plus year cooperative business venture to pursue contracts for and provide title data plant, and later search and exam services to the title industry. Despite the fact HDEP and DBA collectively conducted millions of dollars in annual business, the two entities' business relationship was largely defined by an oral handshake agreement dating from the early 1990's – a conflict in the waiting.

  The twelve separate claims and counterclaims generally fall into three

categories: retrospective, current, and prospective claims. First, HDEP's principle claims are retrospective, alleging that from 2005 until HDEP's termination of the parties' oral agreement in August of 2012, DBA effectively failed to perform its obligations. In connection with this alleged retrospective breach of contract, HDEP claims it incurred over $2 million in damages based on the cost of performing services that otherwise should have been performed by DBA.

Second, both parties assert current claims. DBA asserts that pursuant to the parties' written commission agreement, notwithstanding the August 2012 termination of the oral agreement between HDEP and DBA, HDEP owes DBA commissions on all then-existing customer contracts for the duration of those contracts. For its part, HDEP contends that its August 2012 termination of the parties' oral agreement ended HDEP's obligation to pay further commissions. HDEP also alleges that DBA is liable for defamation and various forms of contractual interference involving the solicitation of existing third-party customers.

Third, DBA asserts prospective claims to a share of HDEP's future income from all previously joint, third-party customers for ten years. DBA claims that HDEP lacks the authority to act unilaterally to not renew existing joint third-party contracts, and that DBA remains entitled to continued commissions based upon its prior work under the parties' cooperative arrangement.

The Court held a bench trial on March 11, 2014, through March 25, 2014. After careful consideration of the evidence, the Court concludes HDEP has failed to prove its retrospective claims involving DBA's breach of its contractual duties. Likewise, DBA has failed to prove that it is entitled to a prospective share of future income from clients with which it no longer has any relationship, and for which DBA provides no ongoing services. As to the claims the Court has classified as current claims, the Court finds that HDEP is required to pay commissions to DBA as specified in the parties' 2012 written Commission Agreement. As to HDEP's current claims, the Court finds that only HDEP's claim for breach of non-competition provisions holds water, and that HDEP has failed to prove either causation or damages for its remaining claims.

This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), and venue is proper pursuant to 28 U.S.C. § 1391(a) and (c). Having heard and weighed all the evidence and testimony presented at trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard plaintiff's and defense counsel's arguments and considered the memoranda submitted, and pursuant to Federal Rules of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law. Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall

operate as findings of fact.

FACTS

I.      <u>Parameters of the Parties' Early Collaboration</u>

HDEP is a Hawaii based company engaged in offshore data entry, including the operation of Datascope, a Manila outsourcing facility that performs data entry and data processing services to the title industry.   DBA is a California company, which prior to its relationship with HDEP, performed consulting work within the title industry.   Until 2003, DBA had one employee, Douglas W. Bello ("Bello") the owner of DBA.   Jeffrey Bates ("Bates"), hired in 2003, is currently the Chief Operating Officer of DBA.

Virendra Nath ("Nath"), the President of HDEP, first met Bello in 1991 while Bello was doing consulting work for another company that was utilizing HDEP's outsourcing services.   Sometime that same year, HDEP and DBA entered into an informal, oral agreement to work together to pursue contracts with title companies to provide data entry services for title documents.   Under this agreement, DBA handled primary sales and marketing, provided project setup and management, billed customers, and provided instruction and training to HDEP employees during occasional trips to HDEP's Manila facility.   HDEP, in turn, provided the resources necessary to execute and deliver title services to customers

including equipment, real estate, software, and a workforce.   The distinct roles of DBA and HDEP were not, however, set in stone.   HDEP also engaged in marketing and performed some of the employee training at its Manila facility.   While each company maintained its name and independent control, they also jointly marketed their services, along with a third company, under the name "Title Team."

In the early years of this relationship, the projects undertaken for clients were typically one-time data entry projects with defined end dates.   These projects entailed building databases or "back plants" for title companies by keying in historical data.   For back plant work, DBA was generally charged with initial project setup during which DBA would work with clients to establish the parameters of the work required and thereafter create instruction sets and manuals for HDEP employees' data entry work.   After work commenced, DBA was also charged with some level of responsibility for quality control and ensuring that the production fulfilled the client's needs.   Because of the one-time nature of back plant work, DBA's "project management" duties were most significant during project setup, and limited during actual production through project completion.   At the time that HDEP and DBA initially joined forces, there were no other companies providing comparable out-sourcing services for the title industry.

During this initial period of collaboration, there was no standardized

third-party customer contract.    Some clients had contracts solely with DBA and others had contracts solely with HDEP.    In either case, the two companies shared duties as described above, and each received a portion of customer revenues.

II.    The Evolution of HDEP and DBA's Business

Beginning sometime in 1997, the nature of HDEP/DBA's work began to evolve from discrete, data entry back plant work, to the ongoing or "day-forward" provision of various title services.    This work entailed the daily entry of title data to update existing title plants, and accessing clients' existing electronic title databases to perform title "searches" and create title reports regarding property insurability. As compared to back plant work, day-forward work required a significantly increased level of ongoing customer interaction and daily oversight or project management.

As the nature, as well as the volume of the work evolved, so too did the responsibilities of HDEP and DBA.    Although HDEP pressured DBA to hire additional staff, DBA did not do so.    Accordingly, by default or acquiescence, HDEP took over much of the daily project management work as well as customer billing that had previously been handled by DBA.    To accomplish these tasks, HDEP hired additional staff.    DBA continued to take primary, though not exclusive, responsibility for sales and marketing and participated in initial project

setup, and some level of ongoing client communication.

It was also around this time of shifting to daily work, in 1998, that HDEP and DBA adopted the practice of entering into joint third-party contracts with clients, under which both DBA and HDEP were expressly identified as the "Contractor." (Exh. 643, e.g. Contracts 49-80.) Unlike back plant work with a defined project scope and end date, day forward work was typically contracted for specified terms subject to automatic renewal for successive terms unless the customer or Contractor acted to prevent automatic renewal as provided in the contract.

While these joint customer contracts formally obligated both companies to the customer and the customer to both companies, they did not delineate the respective duties of HDEP and DBA or specify how either company, individually, would be compensated. The division of revenues between HDEP and DBA was controlled solely by agreements between the companies themselves.

III.    Revenue Sharing Under the Collaborative Agreement

Under HDEP and DBA's initial oral agreement, HDEP would define its per document price for a particular project and DBA would tack on an additional per document charge. Per document payment varied from client to client based on the complexity of the work involved. In 2001, rather than continuing to calculate a per

document payment for each project, Nath and Bello agreed that DBA's commissions for day-forward jobs would come from a standard 12-15% markup over HDEP's price.  (Exhs. 21, 31.)

Compensation to DBA was further formalized in July of 2005, when the parties signed a written commission agreement to "confirm the following business relationship" between DBA and HDEP:

> 1.  <u>Existing Commissions</u>.  HDEP is currently paying DBA the commissions specified on Exhibit A for the existing contracts specified on Exhibit A and will continue to pay such commissions for the duration of such contracts, including all renewals.
>
> 2.  <u>New Contracts</u>.  DBA and HDEP will continue to solicit new contracts, and HDEP will pay DBA a commission on new contracts as mutually agreed or in accordance with the schedule attached as Exhibit B.

(Exh. 48.)    Additionally, this letter contained a stipulation that any third party purchaser of HDEP would be similarly obligated.

In November of the same year, the July 2005 agreement was renewed, with the inclusion of a new section, which provided that, "[i]f the rates payable under any existing contract or renewal are changed, HDEP and DBA will negotiate a new commission for such contract or renewal."  (Exh. 53.)    Finally, on January 12, 2012, the parties executed a third written agreement, substantially identical to the November 2005 agreement, save for an updated "Exhibit A" of then active

third-party contracts on which commissions were to be paid.   (Exh. 190.)   These three written commission agreements are the only writings defining the relationship between HDEP and DBA.

Notably, the 2005 and 2012 formalization of commission payments to DBA paralleled changes within DBA.   In 2005, Bello took a leave of absence from work to undergo cancer treatment.   Upon his successful recovery and return to work, Bello initiated the first 2005 commission agreement.   Thereafter in 2006 and 2007, Bello began to slowly step back from day to day operations at DBA and turned more and more of the operation over to Bates, who he had hired in 2003.   Then in 2012, in conjunction with announcing his formal retirement from DBA, Bello initiated the 2012 updated commission agreement.   It was Bello's intention that Bates would take over DBA's operations.   By executing an updated commission agreement, Bello sought to ensure that DBA would continue to receive the same income stream.

IV.   The End of HDEP and DBA's Collaborative Venture

Beginning in 2006, the steady growth of HDEP/DBA business came to a halt and revenues declined due to a number of factors.   The recession and collapse of the housing market led to a downturn in the title industry, and numerous low-priced outsourcing competitors had entered the market that HDEP/DBA had

previously solely occupied.   Then in 2007, following a trend of title industry consolidation, HDEP/DBA's largest customer, Data Trace, moved all of its business to its own outsourcing facility.   As a result of these combined factors, and perhaps others, from 2005 to 2008, HDEP/DBA revenue declined by almost 50%.   (Exh. 588.)

Although revenues began to rebound from 2009 onward, Nath expressed dissatisfaction with HDEP/DBA's performance, and demonstrated a desire to restructure their business.   (Exh. 132.)   Nath apparently blamed much of their poor performance on DBA's marketing and sales efforts and expressed some dissatisfaction with errors in some of DBA's project setups.   Nath, however, also continued to express hope that HDEP and DBA could collectively rejuvenate their business.

This hope eventually evaporated.   At a meeting in Kansas City in March of 2012, Nath conveyed to Bello that their relationship could not continue in its present form.   In April, Nath followed up on this conversation with an email to Bello formally laying out three possible paths forward: 1) the two companies simply go their separate ways; 2) restructure the "compensation to better reflect the responsibilities" of each party and incentivize increased sales; or 3) HDEP could buy out DBA and merge the two companies.   (Exh. 223.)

Lacking agreement from DBA on any of his proposed paths forward, on May 17, 2012, HDEP presented DBA with a proposed separation agreement. (Exh. 230.) The Separation Agreement proposed terms that would govern the winding up of the parties' business relationship, including the payment of commissions and the disposition of joint contracts, if no new long-term agreement was reached on or before August 15, 2012. (Id.) DBA, however, refused to execute the Separation Agreement and no new long-term agreement was reached by August 15, 2013. Accordingly, on August 22, 2012, HDEP notified DBA via email that "it understands the business relationship between HDEP and DBA is at its end." (Exh. 240.) Although a unilateral action on the part of HDEP, this August 22, 2012, email served as the formal termination of HDEP and DBA's 1991 cooperative oral agreement to solicit for work and to jointly provide title services.

V.    Post-Termination

After HDEP terminated its collaborative agreement with DBA, the future of HDEP/DBA joint customer contracts and their respective revenue became an obvious bone of contention.

A.    Disposition of Joint Customer Contracts

Upon notice of termination in August of 2012, HDEP ceased making

commission payments to DBA,[1] and began unilaterally exercising the non-renewal clauses in joint customer contracts as they reached the end of their respective terms. To exercise non-renewal, HDEP sent existing joint customers a notice of non-renewal within the notification period specified in their respective customer contracts.   (See e.g. Exh. 642 at 4.)   HDEP's notice letters informed customers that HDEP would no longer be entering into new agreements in which both HDEP and DBA are listed as contractors.   The letters continued to expressly invite existing customers to enter in new contracts solely with HDEP, or solely with DBA.   (Id.)

At the time that HDEP terminated its collaborative agreement with DBA, there were 41 existing customer contracts.   (Exh. 644.)   Of this total, 13 have since reached their expiration date.   Of these 13 customers, one acted on its own accord not to renew its contract, and another elected to enter into a replacement contract with DBA only.    HDEP sent the remaining 11 customers notices of non-renewal.   Of the 11 companies that received HDEP's notices of non-renewal, 8 entered into HDEP only contracts, 2 entered into DBA only contracts, and 1 opted not to renew with either company.

Of the 41 contracts in effect at termination, 12 were oral agreements

---

[1]   Pursuant to this Court's Orders of August 20, 2013, and September 20, 2013, Granting Plaintiff's Motion to Deposit Commissions, HDEP has been depositing disputed commissions that may have been owed to DBA on continuing contracts into a Court-held account pending the conclusion of this litigation.   (Docs. 112, 124.)

with no expiration dates.   HDEP subsequently entered into HDEP only written contracts with all 12 customers.   Of the 41 contracts in effect at termination, 15 remain in effect in their previous form and one was effectively terminated by the customer going out of business.   Of these 15 still in effect, 9 are written joint customer contracts, and the remaining 5 are oral contracts with no expiration dates that have not been replaced by written agreements with either HDEP or DBA.

In sum, of the 41 contracts in effect on August 22, 2012, 3 have been canceled or have ceased to exist, 3 have been converted to DBA only written contracts, 20 have been converted to HDEP only written contracts, and 15 continue as joint HDEP/DBA contracts.   Of these 15 ongoing contracts, 9 are written with defined expiration dates and 5 are oral with no defined expiration date or term. (Exh. 644.)

B.      Competition for Customers

In a series of emails between October 16 and 24, 2012, Bello contacted existing joint customer Old Republic Title ("ORT") regarding DBA picking up "policy work."[2]   In addition, Bello discussed ORT's existing "searching agreement" with HDEP/DBA and its provisions for non-renewal and cancelation in generalized terms.   (Exh. 405: ORTC002-0011.)

---

[2] ORT had been a joint customer of HDEP/DBA since September 1, 2007.   (Exh. 643 at 516.)

Shortly after DBA's solicitation of ORT, on October 29, 2012, HDEP and DBA entered into a Mediation Agreement that provided that neither party would solicit existing customers during mediation. (Exh. 241.) The Mediation Agreement also provided that HDEP would resume paying commissions to DBA during the mediation process. (Exh. 241.) HDEP made commission payments to DBA for September, October, and November of 2012. The mediation, however, was unsuccessful and the non-competition agreement and agreement to continue paying commissions expired on November 30, 2012.

Then in December of 2012, the two companies entered into a Partial Settlement Agreement that set terms of permissible competition for "new business" with existing customers, while precluding either party from soliciting existing customers for business predating the termination of the parties' collaborative agreement on August 22, 2012. (Exh. 249.) The Partial Settlement Agreement defined "new business" as: a) "services first performed for any of the customers in a new county" after August 22, 2012; or b) "searching or keying services first begun for any of the customers in any county" after August 22, 2012. (Id.)

On March 18, 2013, pursuant to its customer contract, ORT presented HDEP/DBA with notice of non-renewal for its existing search agreement, which was set to expire in October of 2013. (Exh. 405: ORTC049.) After ORT's notice

of non-renewal, Bello, who had refrained from soliciting business for DBA from ORT after executing the Mediation Agreement and later Partial Settlement Agreement, reinitiated contact with DBA seeking ORT's "search" work after October.   (Exh. 405: ORTC064.)   In May 29, 2013, ORT provided HDEP/DBA with notice that it was terminating its outsourcing agreement.   (Exh. 405: ORTC143.)   Thereafter ORT elected to bring its title work in house and did not execute further agreements with either HDEP or DBA.

After ORT issued its notice of contract termination, on May 30, 2013, DBA sent a letter entitled "Title Team Update," to approximately twenty existing joint customers.   (Exh. 405 at 54.)   The letter informed customers that HDEP had made "an aggressive and surprising push to seize control of the Title Team," and notified customers that HDEP had filed suit to dissolve the business.   The letter continued to inform customers that HDEP cutoff DBA from project communications and noted that DBA had been made aware of errors in HDEP's work.   Finally, the letter requested that customers copy DBA on all communication with HDEP and asked that future payment for services be made jointly to HDEP and DBA.

At the time of HDEP's termination of its agreement with DBA, HDEP/DBA was providing services to North Dakota Guaranty and Title ("NDGT")

pursuant to a contract entered into on February 29, 2012.  (Exh. 720.)  This

contract included an exclusivity clause, which provided that NDGT would provide

"Contractor" with not less than 50% of all "reports" and shall not enter into any

agreement with any third party for the provision of services in North Dakota.  (Id. at

2.)  "Reports" are defined in the outsourcing agreement as ownership and

encumbrance reports ("O&E's"), title commitments ("commitments"), and policies

of title insurance ("policies").

      Prior to termination, HDEP/DBA was performing "O&E," "abstract,"

and "commitment" work for NDGT, but was not performing policy work, although

NDGT's outsourcing agreement contemplated that policy work would eventually be

performed under its HDEP/DBA joint contract, and that quantities of all work would

slowly increase according to a "ramp up" schedule.[3]  (Exh. 700.)  After HDEP

terminated its oral agreement with DBA and after executing the Parties' Partial

Settlement Agreement, DBA entered into a DBA only contract with NDGT to

provide "policy" work, while at the same time continuing to solicit "O&E,"

"abstract," and "commitment" work under the HDEP/DBA joint contract.[4]  In

---

[3] The precise services to be performed under NDGT's outsourcing agreement were in theory to be specified by placing check marks in appropriate boxes in an attachment to the agreement titled "Schedule A."  In actuality, no boxes were ever checked on Schedule A.  (Exh. 720.) Accordingly, information regarding what services were and were not actually performed comes solely from testimony at trial.

[4] DBA was able to enter into independent outsourcing contracts with customers because it formed

addition, DBA performed test "search" work for NDGT with a new outsourcing partner, but never actually contracted to perform search work and was never paid for search work. As of the time of trial, the NDGT joint contract was still in effect with a February 29, 2017 expiration date. (Exh. 644 at 4.) Due to an array of factors including internal problems at NDGT and related problems at HDEP meeting timely completion goals, the volume of work and associated revenue from NDGT has never risen to the levels specified in NDGT's ramp up schedule.

C.    Start of Litigation

On August 16, 2012, HDEP filed its initial three-count Complaint against DBA. (Doc. 1.) This Complaint: 1) sought declaratory judgment that HDEP had the authority not to renew and/or to terminate third-party contracts, and had no continuing duties to DBA outside of these contracts; 2) alleged a claim for breach of contract based upon DBA's failure to fully perform its obligations under the parties' collaborative agreement; and 3) alleged a breach of the duty of good faith and fair dealing.

Shortly thereafter, DBA filed related counterclaims against HDEP: 1) seeking declaratory judgment that the parties had formed a partnership or joint venture; 2) claiming that HDEP had breached accounting duties associated with this

a new partnership with a separate outsourcing firm sometime in February of 2013.

joint venture; 3) alleging a breach of fiduciary duty; 4) asserting a breach of the implied covenant of good faith and fair dealing; and 5) requesting the judicial dissolution of the parties' joint venture.   (Doc. 9-1.)

HDEP later filed a Second Amended Complaint, which, in addition to reiterating the claim for declaratory judgment regarding HDEP's right to terminate or not renew joint contracts, sought declaratory judgment that HDEP and DBA did not form a joint venture.   (Doc. 87.)   The parties later stipulated to dismiss all claims and counterclaims based upon the existence of a partnership or joint venture. (Doc. 159.)

DBA's "Title Team Update" letter to existing customers and continued dispute over commissions prompted an array of pretrial motions.   The issue of disputed commissions owed to DBA was temporarily resolved by this Court's Orders of August 20, 2013 and September 20, 2013, which required HDEP to deposit disputed commissions for continuing contracts into a Court-held account. (Docs. 112, 124.)   The issue of continued competition for customers was to some extent resolved by a September 30, 2013, stipulation that, for the duration of litigation, the parties would limit their communications with continuing customers solely to normal project communications relating to services under agreements with those customers in effect prior to August 22, 2012.   (Doc. 129.)   This stipulation

expressly excluded permissible solicitation of "new business" as defined in the December 2012, Partial Settlement aAgreement.

On December 5, 2013, this Court heard HDEP's Motion for Partial Summary Judgment on Count I of its Second Amended Complaint, seeking a declaratory ruling that all existing agreements between HDEP and DBA had been validly terminated. The Court held that "the oral agreement between HDEP and DBA, as to all future, prospective business collaboration between the parties was validly terminated." Honolulu Data Entry Project , Ltd. v. D. Bello Assoc., Civ. No. 12-467 BMK, 2013 WL 6838276, *7 (D. Haw. Dec. 26, 2013). The Court also held however, that "this holding has no effect on any current or ongoing duties and obligations of the parties, including any obligation to pay commissions on third-party contracts, entered into prior to termination." (Id.)

In the current iteration of its Complaint, HDEP asserts eight Counts against DBA, Bello, and Bates:

Count I – Declaratory Judgment that the oral agreement between HDEP and DBA has been validly terminated and that HDEP has no continuing obligation to pay commissions to DBA or to renew contracts with existing customers and DBA;

Count II – Breach of Contract and of the Covenant of Good Faith and Fair Dealing, alleging that since 2005, DBA has failed to fully perform all its obligations under the parties' original oral contract;

Count III – Breach of Contract, alleging that DBA violated the

non-competition provision of the parties' December 2012 Partial Settlement Agreement;

Count IV – Unfair Competition in violation of Hawaii Revised Statute ("HRS") § 480-2, alleging that DBA made dishonest and disparaging representations about HDEP to customers;

Count V – Defamation, alleging that DBA, Bello, and Bates made false and defamatory statements concerning HDEP;

Count VI – Tortious Interference with Prospective Business Advantage, alleging that Bell and Bates purposefully interfered with HDEP's exclusive business relationships;

Count VII – Tortious Interference with Contractual Relationships, alleging that Bello and Bates intentionally induced customers to breach their existing contracts with HDEP; and

Count VIII – Fraudulent Inducement, alleging that Bates and Bello conspired to interfere with and steal away existing customers from HDEP.

(Third Amended Complaint, Doc. 204.)

DBA in turn asserts four counter-claims against HDEP:

Count I – Breach of Contract, alleging that since terminating their collaboration, HDEP has failed to pay commissions to DBA as specified in the parties January 2012, written commission agreement, including for all reasonably foreseeable contract renewals;

Count II – Accounting, alleging that DBA is entitled to an accounting of all amounts owing and unpaid to DBA since termination of the oral agreement;

Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing by refusing to pay commissions and unilaterally terminating joint DBA-HDEP customer contracts and reentering into HDEP only customer contract;

Count IV – Declaration as to DBA's rights to Intellectual Property including matrices, manuals, instructions, protocols, and software utilized in servicing customers.

(Amended Counterclaim, Doc. 152.)

## DISCUSSION

I.    Retrospective Claims

HDEP's primary claim in terms of alleged damages (Count II) is that from 2005 until termination of the parties' oral agreement in August of 2012, DBA failed to perform its obligations under the agreement "as revised over time by agreement of the parties."   The meat of HDEP's claim is that DBA was obliged under the parties' 1991 oral agreement to perform daily "project management," which DBA largely ceased to do as the nature of HDEP/DBA business evolved from back plant to day forward services.   In connection with this alleged breach, HDEP seeks a refund of $3,857,036.64, the amount paid to DBA in commissions since 2005, or alternatively, $2,212,287.25 in expenses HDEP incurred to perform DBA's project management functions.   In addition, HDEP seeks a refund of $219,277.79 for commissions paid to DBA from September to November of 2012 under the parties' Mediation Agreement.

In the first instance, there is no basis for the complete refund of all commissions paid to DBA since 2005.   HDEP admitted at trial that DBA

contributed significant value to their collaborative agreement. There is no evidence that a failure of partial performance, assuming there was such a failure, rendered DBA's contribution valueless. See Golf Carts, Inc. v. Mid-Pacific Country Club, 493 P.2d 1338, 1339 (Haw. 1972) ("rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement.").

As to HDEP's alternative claim for reimbursement of costs, DBA asserts two defenses to HDEP's claim: first, that HDEP, by its actions, agreed to a modification of the parties' 1991 oral agreement under which it would perform project management; or, second, that HDEP waived DBA's performance of project management by expressly agreeing to pay and by actually paying DBA unmodified commissions.

"In order for an oral contract to be enforceable, there must be an offer, an acceptance, and consideration." Douglass v. Pflueger Hawaii, Inc., 135 P.3d 129, 134 (Haw. 2006). Additionally, "it is a fundamental principle of law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." Carson v. Saito, 489 P.2d 636, 638 (Haw. 1971).

Neither HDEP nor DBA dispute that in 1991, the parties entered into an oral agreement under which they would jointly solicit and perform outsourcing

services for the title industry.   Both parties agree that DBA was primarily

responsible for sales and marketing, project setup, project management, and training

of HDEP staff.   Project management in 1991, entailed specific discrete tasks:

perhaps an initial client meeting to establish the parameters of the client's needs, the

creation of project specific instruction sets and manuals, some level of initial

training, and some level of intermittent quality control during the project.

By 2005, due to the evolution of HDEP/DBA business from back plant

to day-forward work and the expansion of title services, the meaning of "project

management" had dramatically changed.   The nature of the services that

HDEP/DBA was then providing required continual, ongoing daily oversight and

client interaction.   In this changed environment, it is undisputed that HDEP

performed most of the project management required for day-forward projects after

2005.

HDEP argues that, because there was never new consideration, there

was never a valid modification of the parties' oral agreement such that DBA was

never relieved of its obligation to provide project management.   See Shanghai Inv.

Co., Inc., v. Alteka Co., Ltd., 993 P.2d 516, 530 (Haw. 2000) ("a modification of a

contract must be supported by new consideration.")   This argument cuts both ways,

however, because it is also evident that there was never a valid modification of the

contract so as to redefine the practical meaning of "project management."

As business evolved, there was never a revised "meeting of the minds" setting out precisely what the duties and obligations of each party would be. Rather, HDEP assumed the new tasks associated with project management without ever clearly informing DBA that it considered DBA to be in default of its obligations.   To be sure, HDEP occasionally complained about DBA's sales performance, but never, until the end, demanded a rebalancing of revenues based on changes in the parties' respective contribution to the business.

Moreover, HDEP executed an express written agreement in 2012 that it would pay DBA commissions on then existing accounts in precisely the same fashion that it had in 2005.   HDEP entered into this agreement with full knowledge of the work that DBA was and was not performing.   The Court finds that this express written agreement coupled with HDEP's course of conduct constituted either waiver of HDEP's rights to receive additional project management services from DBA, or simply an acceptance of the adequacy of the limited project management that DBA still provided.    See Coon v. City and County of Honolulu, 47 P.3d 348, 376 (Haw. 2002) ("waiver may be expressed or implied and it may be established by express statement or agreement, or by acts and conduct from which an intention to waive may be reasonably inferred.").

Accordingly, the Court holds that HDEP has failed to show that DBA was in breach of contract from 2005-2012.   Neither a refund of commissions paid to DBA during this period, nor a payment of HDEP's purported additional costs is warranted.

II.     Current Claims

    A.     DBA's Counter Claim for Commissions Owed Under 2012 Commission Agreement

DBA's claim for breach of contract (Count I) asserts that, by failing to pay commissions to DBA on existing joint contracts since August 2012, HDEP is in breach of the parties' cooperative agreement and January 2012 written Commission Agreement.[5]   HDEP asserts that its termination of its collaborative agreement with DBA relieved it of any obligation to continue commission payments to DBA.

This Court has determined that HDEP's termination of its oral collaborative agreement relieved HDEP of the obligation of pursuing future third-party contracts in collaboration with DBA, but reserved judgement on any duties or obligations established prior to termination.   Honolulu Data Entry Project, Ltd. v. D. Bello Assoc., Civ. No. 12-467 BMK, 2013 WL 6838276 at *6.   Now that the record has been more fully developed, the Court holds that HDEP's obligation to

---

[5] The Court considers the prospective portion of DBA's Count I regarding future renewals of joint customer contracts in the later discussion of prospective claims.

pay commissions to DBA under the parties' January 2012 Commission Agreement was not eliminated by the termination of the oral agreement.

To maintain a cause of action for breach of contract, DBA must prove: (1) that a contract exists between the parties; (2) that the plaintiff performed their contractual duties or was excused from their non-performance; (3) that the defendant failed to perform their contractual duties; and (4) that plaintiff's damages were a result of defendant's failure to perform.   See, Hawaii Civil Jury Instructions, Instruction No. 15.8 (1999); see also Otani v. State Farm Fire & Cas. Co., 927 F.Supp. 1330, 1335 (D. Haw. 1996) (aff'd in part, rev'd in part on other grounds).

Both parties agree that a valid oral contract existed between the parties. The parties' 2012 Commission Agreement, though it did not supplant the oral agreement, imposed the specific obligation that HDEP pay commissions to DBA as specified in the attached list of then existing joint contracts.   These commissions were bargained for and paid in recognition of DBA's sales and marketing efforts in establishing the various accounts, as well as for some level of ongoing work on the accounts.

As already discussed above, the court holds that DBA substantially met its obligations under the parties' collaborative agreement and was not, as asserted by HDEP, in breach such that HDEP would be relieved of its obligations under the

agreement. These obligations include the payment of commissions as specified in the 2012 Commission Agreement. HDEP may not relieve itself of this obligation by choosing to exclude DBA from its ongoing business. To the extent that any ongoing work that DBA would have been performing on continuing joint contracts has ceased, the court holds that DBA's non-performance is excused by HDEP's unilateral actions.

HDEP's refusal to pay commissions is therefore in breach of its binding obligations established prior to termination. Accordingly, HDEP owes DBA commissions from August 22, 2012, as specified in the 2012 Commission Agreement, including commissions on joint contracts with Lender's Title Company and North Dakota Guaranty and Title, subject to the following qualifications:

(1) On those joint contracts that reached their natural expiration and were then replaced by either HDEP or DBA only written contracts, HDEP owes commissions to DBA only until their respective dates of expiration;

(2) On those joint contracts that were oral and later converted to HDEP only contracts, HDEP owes commissions only until the date a written contract was executed;

(3) On written joint contracts that are still ongoing, HDEP owes DBA commissions until the contracts reach their respective expiration dates, or until a party to the joint contract avails itself of the joint contract's termination provisions;

(4) On ongoing joint contracts that are oral, with no expiration date, and that have not been supplanted by a written contract, HDEP's obligation to pay commissions ceased on August 22, 2012.

To effectuate the Court's ruling, HDEP shall provide DBA with an accounting of all revenues received from all customers listed in the January 2012 Commission Agreement from August 22, 2012 through the various dates described above.

DBA's claim for breach of contract also asserts that HDEP is obligated to pay continuing commissions on all joint contracts into the future, based upon the premise that joint customer contracts almost always auto-renewed, and the January 2012 commission agreement states that commissions would be paid on listed contracts "including all renewals."   As discussed in more detail in part III below devoted to DBA's prospective claims, the Court holds that neither the parties' oral agreement, nor the January 2012 commission agreement bound HDEP to continue renewing joint customer contracts against its will.   Accordingly, HDEP's obligation to pay commissions to DBA ceases when a joint contract ends and does not continue based upon a presumption of joint contract renewal.

B.   Counter Claim IV - DBA's Claim for a Declaration of DBA's Rights to Intellectual Property

DBA seeks a declaration as to its rights to jointly created matrices, manuals, instructions, protocols, and other intellectual property used to provide services to HDEP/DBA joint customers.   Additionally DBA asks that the court require HDEP to provide DBA with copies of all such items.   HDEP concedes the

joint ownership of these materials, but contends that DBA has no legal basis to compel HDEP to provide copies.

Because DBA failed to present argument or evidence at trial regarding HDEP's obligation to provide copies of joint intellectual property, the Court limits its ruling to hold that DBA is a joint owner of all jointly created matrices, manuals, protocols, and other intellectual property prepared in performance of joint customer contracts.

      C.      <u>HDEP's Current Claims for Breach of Contract, Defamation, Unfair Competition, Tortious Interference, and Fraudulent Inducement</u>

HDEP's current claims, though based upon multiple causes of action, focus on purported losses due to DBA's alleged interference with existing joint contracts with Old Republic Title ("ORT") and North Dakota Guaranty and Title ("NDGT"), and from more generalized damage allegedly caused to HDEP's business and reputation by DBA's May 30, 2013, "Title Team Update" letter.

      i.      <u>Breach of Contract (Count III)</u>

HDEP alleges that DBA violated the non-competition provision of the parties' December 2012, Partial Settlement Agreement by soliciting business from existing customers ORT and NDGT. This Partial Settlement Agreement precluded either party from soliciting existing customers, save for the permissible solicitation

of "new work," as defined in the Partial Settlement Agreement.

In regard to ORT, HDEP asserts that as a result of DBA's breach, HDEP suffered: 1) $40,607 in lost profits for three months due to ORT's early cancelation of its joint contract, 2) $26,143 in damages arising from a drop in profits over seven months preceding ORT's cancelation; and 3) $653,275 in five years of expected future profits.   In regard to NDGT, HDEP asserts it suffered $116,016 in lost profits due the failure of NDGT's work quantities to ever reach expected levels.

In regard to ORT, DBA's solicitation of "policy work" via emails in October of 2012, and DBA's general discussion of ORT's contract termination and non-renewal provisions predate the parties' December 2012, Partial Settlement Agreement.   Therefore these conversations cannot constitute breach of an agreement that did not yet exist.   While DBA did solicit ORT for "search work" after the non-solicitation provisions of the Partial Settlement Agreement became effective, this came after ORT had already provided notice that it would not be renewing its HDEP/DBA joint contract.   Accordingly, DBA's solicitation for "search work" cannot have caused ORT's prior decision to not renew its outsourcing agreement.   There is therefore no basis for the claim that DBA's solicitation caused HDEP five years of projected losses arising from non-renewal of ORT's contract.

In regard to early termination, the parties argue about whether

solicitation for search work was or was not prohibited by the Partial Settlement Agreement. The court holds that the distinction is irrelevant because HDEP failed to prove that DBA's solicitation for search work caused ORT's early termination or any prior drop off in business leading up to termination. DBA did not receive any work from ORT before or after termination. ORT simply chose to do the work itself, something that it had apparently been considering for some time. Without more than the couple of brief emails before the court, the claim that DBA's actions caused the decline and eventually early loss of ORT's business is merely speculative.

As to NDGT, at the time of HDEP's termination of its collaborative agreement with DBA, HDEP/DBA had a joint contract with NDGT to perform 50% of all reports within the state, which included policy work. This contract, to which DBA was a party, expressly precluded NDGT from entering into any other third-party contracts for provision of title services within the state. NDGT's business was planned for a gradual ramp up, and at the time of termination, HDEP/DBA had not yet actually begun to perform the policy work. After execution of the non-competition provision of the Partial Settlement Agreement, DBA solicited and began to perform policy work for NDGT at the same time HDEP/DBA continued to perform O&E, abstract, and commitment services under

the joint contract.   DBA asserts that because HDEP had not yet begun to perform policy work, its policy work would be considered "new business" outside of the non-competition provision the Partial Settlement Agreement.

The Court disagrees.   In relevant part, the Partial Settlement Agreement defined "new business" as "services first performed for any of the customers in a new county" after August 22, 2012.   The exclusivity clause in the joint outsourcing agreement with NDGT, guaranteed work on reports including policy work will be offered only to HDEP/DBA.   The outsourcing agreement further provided that the exclusivity provision applied to all of NDGT work in North Dakota.   Because the outsourcing agreement covered the entire state of North Dakota, there was no new county outside the existing joint outsourcing agreement. Moreover, as the outsourcing agreement precluded NDGT from contracting with any other third-party service provider, surely it would be illogical to then permit DBA, a party to the joint outsourcing agreement, to itself become another third-party service provider for NDGT.

Accordingly, the Court holds that DBA breached both the NDGT outsourcing agreement, to which it was a party, and the Partial Settlement Agreement's non-competition provision.   But for DBA's breach, the Court concludes that HDEP would have performed NDGT's policy work just as it

continued to perform other title services.

Because HDEP/DBA's continuing joint outsourcing agreement with NDGT runs until February 29, 2017, the Court holds that DBA is liable to HDEP for 85% of revenues received from NDGT for all policy work done from August 22, 2012, until February 29, 2017.[6] This holding is in keeping with the Court's ruling on revenue sharing for all other joint contracts since HDEP acted to terminate its collaboration with DBA.

As to HDEP's claim that DBA is also liable for damages for overall shortfalls in work promised by NDGT under the joint outsourcing agreement, the Court holds that HDEP has failed to prove that DBA caused the failure to ramp up to expected volumes. While evidence of internal problems at NDGT and performance problems at HDEP/DB were presented at trial, there was no convincing evidence that DBA caused any other shortfalls in work provided by NDGT.

      ii.     Unfair Competition (Count IV) and Defamation (Count V)

HDEP's claims for unfair competition and defamation are both premised on alleged damages caused to HDEP's business with ORT and NDGT from DBA's May 31, 2013 "Title Team Update" letter to customers. HDEP asserts

---

[6] Whether DBA wishes to continue performing policy work for NDGT for the term of the existing joint outsourcing agreement is up to DBA.

that it suffered damages identical to those it suffered from DBA's breach of contract discussed above, but also claims it is entitled to treble damages under HRS § 480-2 in the amount of $2,508,123.12.

"To state a claim for unfair competition a plaintiff must allege facts showing (1) a violation of HRS chapter 480; (2) which causes an injury to the plaintiff's business or property; and (3) proof of the amount of damages." BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., 780 F. Supp. 2d 1061, 1074 (D. Haw. 2011).   A violation of HRS § 480, occurs when a defendant makes "(1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3) the representation, omission, or practice is material."   Courbat v. Dahana Ranch, Inc., 141 P.3d 427, 435 (Haw. 2006).

DBA's Title Team Update letter was sent after ORT had already terminated it outsourcing contract with HDEP/DBA.   Accordingly, the Court holds that, with regard to ORT, DBA's letter was not a cause of injury to HDEP.   As to NDGT, as discussed above, HDEP's claim that DBA caused the failure of NDGT's work volumes to ramp up as expected is speculative at best.   No compelling evidence was presented that would lead the Court to the conclusion that DBA's letter led to this shortfall.   Accordingly, HDEP has failed to prove its claim for

unfair competition.

To prevail on a claim of defamation, a plaintiff must prove four

elements:

> (a) a false and defamatory statement concerning another;
> (b) an unprivileged publication to a third party; (c) fault
> amounting to at least negligence on the part of the
> publisher [actual malice where the plaintiff is a public
> figure]; and (d) either actionability of the statement
> irrespective of special harm or the existence of special
> harm caused by the publication.

Lucas v. Citizens Commc'ns Co., 409 F. Supp. 2d 1206, 1223-24 (D. Haw. 2005).

In determining whether statements are false or defamatory, courts consider "whether

general tenor of the entire work negates the impression that the defendant was

asserting an objective fact," and thus presenting non actionable "opinions that do not

imply facts capable of being proved true or false." Miracle v. New Yorker

Magazine, 190 F.Supp.2d 1192, 1198 (D. Haw. 2001). "Moreover, even if a

statement falls outside of the category of pure opinion, it must be reasonably

susceptible of a defamatory meaning to be actionable." Id. at 1199. "A statement

has defamatory meaning when it tends to "harm the reputation of another as to lower

him in the estimation of the community or deter third persons from associating or

dealing with him." Id.

DBA's Title Team Update letter stated that HDEP had "began an

aggressive and surprising push to seize control" of joint business, "removed [DBA] from project communications in a likely attempt to keep [DBA] 'in the dark'," and made efforts to exclude DBA "from all information of work being performed."   In addition, DBA's letter informed customers that it had become aware of errors in HDEP work that concerned DBA "greatly."

The Court holds that none of these statements qualify as defamatory. HDEP had indeed taken action to take some level of control over joint business and had ceased paying DBA commissions.   DBA's description of these actions as "aggressive" or "surprising" is non-actionable opinion.   HDEP did remove DBA from some communication and DBA's characterization of HDEP's "likely" intention is merely opinion.   Similarly there was evidence of some errors and DBA's expression of "great" concern is again only opinion.   Though HDEP clearly did not cut DBA off from <u>all</u> communication, this statement is not "reasonably susceptible of defamatory meaning."   Accordingly, HDEP has not proven that DBA's "Title Team Update" letter caused cognizable harm to its reputation or business.

<blockquote>iii.   <u>Tortious Interference With Prospective Business Advantage (Count VI), Tortious Interference with Contractual Relationship (Count VII), and Fraudulent Inducement (Count VIII)</u></blockquote>

Both of HDEP's claims for tortious interference effectively restate the

same claims for damages associated with its ORT and NDGT joint contracts. Both causes of actions require a plaintiff to prove causation and actual damages. <u>See Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc.</u>, 982 P.2d 853, 887 (Haw. 1999) (stating the elements for tortious interference with prospective business advantage); <u>see also</u> <u>Lee v. Aiu</u>, 936 P.2d 655, 668 (Haw. 1997) (discussing the elements for tortious interference with contractual relations). As already discussed above, the Court finds that HDEP failed to prove DBA caused either the termination of ORT's contract or the low volumes of work under the NDGT contract. Accordingly, HDEP has failed to prove its claims for tortious interference.

As to HDEP's Fraudulent Inducement Claim, fraudulent inducement entails "1) a representation of a material fact; 2) made for the purpose of inducing the other party to act; 3) known to be false but reasonably believed to be true by the other party; and 4) upon which the other party relies and acts to his or her damage." <u>Matsuura v. E.I. dupont De Nemours & Co.</u>, 172 P.3d 1021, 1029 (Haw. 2007). HDEP asserts that DBA fraudulently induced HDEP to enter into the Partial Settlement Agreement that precluded competing for existing customers, knowing full well that DBA would not adhere to the agreement, and that HDEP was damaged by its reliance DBA's false representation.

As has already been discussed, HDEP failed to show that DBA's

solicitation of ORT's business caused any injury to HDEP, and, aside from the policy work already address by the Court, failed to show that DBA caused lower then expect volumes of work from NDGT. Because it has not been proven that DBA caused either ORT's termination or NDGT low volumes, HDEP has not been damaged by DBA's actions. Nor has HDEP shown that it was induced to act in a way that caused it damages vis a vis the ORT of NDGT contracts. Accordingly, HDEP's claims for tortious interference and for fraudulent inducement must fail.

III.  Prospective Claims

DBA asserts that HDEP breached the covenant of good faith and fair dealing (Part of Count I and Count III) by unilaterally acting, after termination of its oral agreement with DBA, to not renew joint customer contracts as they reached the end of their terms. DBA asserts that because these joint contracts were auto-renewing, HDEP's unilateral action deprived DBA of $8,001,305 in commissions projected over ten years. DBA's claim is premised upon the idea that even though DBA may not be actively providing any services to clients over this future ten year period, it is due a commission based upon its initial efforts to secure clients, and setup up the accounts, and based upon the 2005 and 2012 written Commission Agreements that state DBA shall receive "commissions for the duration of such contracts, including all renewals."

In this Court's December 26, 2013 order granting in part and denying in part HDEP's motion for partial summary judgment, the Court held that the oral collaborative agreement between HDEP and DBA was a contract of perpetual duration and therefore terminable at will by either party.   See Honolulu Data Entry Project , Ltd. v. D. Bello Assoc., Civ. No. 12-467 BMK, 2013 WL 6838276, at *5. At that time, because of an incomplete record and in light of the summary judgment standard, the Court held that this ruling did not speak to HDEP's power to unilaterally cancel or refuse to renew third party contracts.   Id.

With the benefit of a complete record, the court extends its earlier ruling and holds that just as DBA may not compel HDEP to remain party to an oral contract of perpetual duration, it may not compel HDEP to renew joint contracts with third party customers indefinitely or for an arbitrary period of ten years.   The 2012 Commission Agreement, which provided that DBA shall receive commissions for the "duration of such contracts including all renewals," does not by itself compel HDEP to renew joint contracts against its will.

If no party empowered to do so acts to prevent auto-renewal of a joint contract, then the plain language of the Commission Agreement would obligate HDEP to continue paying DBA a commission as specified.   But where either HDEP, DBA, or the customer acts to end the auto-renewal of a joint contract, no

continuing obligation to pay commissions exists.    Accordingly, the Court holds that DBA has failed to prove its claim that HDEP breached the covenant of good faith and fair dealing.

## CONCLUSION

For the foregoing reasons, judgment shall be entered as follows:

I.    <u>HDEP's Claims</u>

(Count I) – <u>Declaratory Judgment</u>.    Judgment shall be entered in favor of HDEP and against DBA to the extent that HDEP validly terminated it cooperative agreement with DBA on August 22, 2012, and has no continuing obligation to renew joint contracts with existing joint customers.    Judgment shall be entered against HDEP and for DBA to the extent that HDEP's termination of its cooperative agreement did not relieve HDEP of the obligation to pay commissions to DBA as established under the parties' cooperative agreement and their January 2012 Commission Agreement.    (<u>See</u> DBA's related Count I)

(Count II) – <u>Breach of Contract and of the Covenant of Good Faith and Fair Dealing</u>.    Judgment shall be entered against HDEP and for DBA.

(Count III) – <u>Breach of Contract</u>.    Judgment shall be entered against HDEP and for DBA to the extent that DBA did not breach the non-competition provisions of the parties' December 2012 Partial Settlement Agreement with respect

to joint customer ORT.   Judgment shall be entered for HDEP and against DBA to the extent that DBA did breach the non-competition provisions of the parties' December 2012 Partial Settlement Agreement with respect to joint customer NDGT. In connection with this breach, DBA shall pay HDEP 85% of the revenues it received from NDGT for providing policy services.   DBA shall continue to be liable to HDEP for 85% of such revenues until February 29, 2017, or until DBA ceases to perform policy work for NDGT.

(Count IV) – <u>Unfair Competition</u>.   Judgment shall be entered against HDEP and for DBA.

(Count V) – <u>Defamation</u>.   Judgment shall be entered against HDEP and for DBA.

(Count VI) – <u>Tortious Interference with Prospective Business Advantage</u>.   Judgment shall be entered against HDEP and for DBA.

(Count VII) – <u>Tortious Interference with Contractual Relationship</u>. Judgment shall be entered against HDEP and for DBA.

(Count VIII) – <u>Fraudulent Inducement</u>.   Judgment shall be entered against HDEP and for DBA.

II.   <u>DBA's Claims</u>

(Count I) – <u>Breach of Contract</u>.   Judgment shall be entered for DBA

and against HDEP to the extent that HDEP has breached its obligations to pay DBA commissions as set out in the parties' January 2012 Commission Agreement. In connection with this breach, HDEP shall pay DBA commissions from August 22, 2012, as specified in the 2012 Commission Agreement, including commissions on joint contracts with Lender's Title Company and North Dakota Guaranty and Title, subject to the following qualifications:

(1) On those joint contracts that reached their natural expiration date and were then replaced by either HDEP or DBA only written contracts, HDEP owes commissions to DBA only until the contracts respective dates of expiration;

(2) On those joint contracts that were oral and later converted to HDEP only contracts, HDEP owes commissions only until the date a written HDEP only contract was executed;

(3) On written joint contracts that are still ongoing, HDEP owes DBA commissions until the contracts reach their respective expiration dates, or until a party to the joint contract avails itself of the joint contract's termination provisions;

(4) On ongoing joint contracts that are oral, with no expiration date, and that have not been supplanted by a written contract, HDEP's obligation to pay commissions ceased on August 22, 2012.

Judgment shall be entered against DBA and for HDEP to the extent that HDEP is under no contractual obligation to renew joint contracts that were in existence on August 22, 2012. Therefore, HDEP's obligation to pay commissions to DBA ends when a joint contract ends.

(Count II) – <u>Accounting</u>. Judgment shall be entered for DBA and

against HDEP.   HDEP shall provide DBA with an accounting of all revenues received on joint customer contracts from August 22, 2012 until each contracts respective expiration date.

(Count III) – <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>.   Judgment shall be entered against DBA and for HDEP to the extent that HDEP was within in rights to act unilaterally to not renew HDEP/DBA joint customer contracts.   Judgment shall be entered for DBA and against HDEP to the extent that HDEP was in breach when it ceased paying commission on existing joint customer contracts after August 22, 2012.   Because the substance of this breach mirrors DBA's Count I, however, no additional damages are due to DBA.

(Count IV) – <u>Declaration as to DBA's Rights to Intellectual Property</u>. Judgment shall be entered for DBA and against HDEP to the extent that the Court declares that DBA and HDEP are co-owners of all jointly created matrices, manuals, protocols, and other Intellectual Property ("IP") utilized in servicing their joint customers.   Judgment shall be entered against DBA and for HDEP to the extent that DBA failed to establish a right to compel HDEP to provide DBA with copies of all such IP.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 10, 2014



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Honolulu Data Entry Project, Ltd. dba HDEP International v. D. Bello Associates, et al., Civ. No. 12-467 BMK, AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW.